**<u>NOT FOR PUBLICATION</u>**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MELLANIE GAYMON, et. al.,<br><br>                        Plaintiffs,<br><br>v.<br><br>SHERIFF'S OFFICER EDWARD<br>ESPOSITO, et. al.,<br><br>                        Defendants. | Civil Action No. 11-4170 (JLL)<br><br><br>**OPINION** |

**LINARES**, District Judge**.**

This matter comes before the Court by way of three (3) motions to dismiss Plaintiffs'

Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by the

following Defendants: (1) Essex County Sheriff's Office (and/or County of Essex), Officer

Esposito,[1] Sheriff Armando Fontoura, Undersheriff Kevin Ryan [Docket Entry No. 68], (2)

Lieutenant Peter Corbo [Docket Entry No. 89], and (3) Captain Kevin Pascoal [Docket Entry No.

90]. The Court has considered the submissions made in support of and in opposition to the

instant motions. No oral argument was heard. Fed. R. Civ. P. 78. Based on the reasons that

follow, Defendants' motions are granted in part and denied in part. Plaintiffs may file a Third

Amended Complaint on or before **September 30, 2013,** solely for the purpose of: (a) omitting

those claims (and facts corresponding thereto) which have now been dismissed *with* prejudice by

---

[1] Defendant Officer Esposito filed an informal application on March 19, 2013, seeking to both
join in and supplement the motion to dismiss filed by co-defendants Essex County Sheriff's
Office, Sheriff Armando Fontoura and Undersheriff Kevin Ryan. [Docket Entry No. 69].

the Court, (b) repleading those claims which the Court has allowed to proceed at this time, and (c) curing the pleading deficiencies in Counts One and Three.

## BACKGROUND[2]

On July 16, 2010, Plaintiffs' decedent Defarra I. Gaymon ("Decedent" or "Mr. Gaymon"), the chief executive officer of a credit union in Atlanta, Georgia, was in Branch Brook Park in Newark, New Jersey at approximately 6:15 p.m.  (Second Am. Compl., ¶¶ 14-16).  The Essex County Sheriff's Office ("ECSO"), which is a law enforcement agency and department within the County of Essex, patrols several Essex County parks, including Branch Brook Park. (*Id.*, ¶ 8).  Sheriff Armando Fontoura and Undersheriff Kevin Ryan are responsible for training Sheriff's Officers and for ensuring compliance with ECSO standard operating procedures. (*Id.*, ¶¶ 9-10).  At all relevant times, the ECSO had a standard operating procedure ("SOP") requiring a minimum of four officers to be utilized for undercover quality of life details in the Essex County parks.  (*Id.*, ¶ 27).

On the night in question, Defendant Sheriff's Officer Edward Esposito ("Officer Esposito") and Sheriff's Officer David Cohen ("Officer Cohen") were conducting an undercover quality of life detail, in plain clothes, at Branch Brook Park.  (*Id.*, ¶ 28).    They were the only two officers assigned to the plain clothes/undercover detail in Branch Brook Park that night. (*Id.*, ¶ 28).

 Mr. Gaymon was allegedly unarmed at said Park when an encounter occurred between himself and Defendant Officer Esposito. (*Id.*, ¶¶ 17-18).   The Second Amended Complaint alleges that Officer Esposito chased Mr. Gaymon to a pond located within the park. (*Id.*, ¶ 19).

---

[2] The following relevant facts are accepted as true for purposes of the instant motions. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

Because the pond was in front of Mr. Gaymon, he apparently had no avenue of escape. (*Id.,* ¶ 21). It is further alleged that Mr. Gaymon then got down on his knees, and Defendant Officer Esposito approached him from behind without backup. (*Id.,* ¶¶ 20, 22). Defendant Officer Esposito then allegedly kicked Mr. Gaymon several times and unholstered and drew his gun. (*Id.,* ¶¶ 23-24). Officer Esposito then purportedly took aim with his revolver and fired it once at Mr. Gaymon, hitting him with a bullet in the stomach and causing his death. (*Id.,* ¶ 25).

In light of the foregoing facts, Plaintiffs initiated this matter on June 17, 2011, by filing a Complaint in the Superior Court of New Jersey. Shortly thereafter, Defendants removed this matter to this Court on July 20, 2011. This Court's jurisdiction is premised on 28 U.S.C. §§ 1331, 1367. On January 27, 2012, Defendants filed a motion for judgment on the pleadings. The Court granted said motion without prejudice on March 29, 2012. Since then, Plaintiffs have filed two amended complaints. The Second Amended Complaint, filed on February 15, 2013, is now the operative complaint in this matter. *See* Docket Entry No. 67.

Plaintiffs' Second Amended Complaint alleges three violations of 42 U.S.C. § 1983. Count One alleges a claim of excessive force pursuant to 42 U.S.C. § 1983 as against Officer Esposito. Count Two contains a claim of failure to train and/or supervise, in violation of § 1983, as against the ECSO, County of Essex and the Supervisory Defendants.[3] Count Three alleges a *Monell* claim of failure to follow standard operating procedure, in violation of § 1983, as against Defendant County of Essex.[4] Count Four alleges a violation of the New Jersey Civil Rights Act,

---

[3] The Supervisory Defendants include County of Essex, the Essex County Sheriff's Office, Sheriff Armando Fontoura, Undersheriff Kevin Ryan, Captain Kevin Pascoal, and Sergeant Peter Corbo. *See* Sec. Am. Compl., ¶ 33.

[4] Although it is unclear from the Second Amended Complaint whether this claim is asserted against all or some of the defendants, Plaintiffs' brief in opposition to Defendant Esposito and the Supervisory Defendants' motion to dismiss makes clear that Count Three purports to assert a

N.J.S.A. 10:6-2, as against Defendant Officer Esposito.  Counts Five and Six allege state law tort claims act violations as against the ECSO, County of Essex and the Supervisory Defendants, based upon excessive force and failure to train/supervise.   Count Seven contains a wrongful death claim pursuant to N.J.S.A. 2A:31-1, et seq, as against Defendant Officer Esposito and the Supervisory Defendants.  Finally, Count Eight purports to assert a "survival action" pursuant to N.J.S.A. 2A:15-3 as against all Defendants.[5]

Defendants have now filed motions to dismiss all Counts of the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570  (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-

---

*Monell* claim as against the County of Essex.  *See* Pl. Opp'n Br. at 21 (referring to Count Three as "Monell Claim, Official Capacity Liability Defendant Essex County" and noting that "Plaintiffs' Second Amended Complaint sets forth a plausible claim that Defendant Essex County's custom of understaffing its Quality of Life Details resulted in the deprivation of Defarra Gaymon's constitutional rights.").

[5] The Court has made every effort to liberally construe Plaintiffs' Second Amended Complaint and to decipher which counts are asserted against which defendants.  The Court notes that Counts Two and Three of the Second Amended Complaint are, in many ways, overlapping.  To the extent the manner in which the Court has construed such claims is different than Plaintiffs intended, the Court finds that said claims do not meet the Rule 8(a) pleading standard inasmuch as they fail to provide each of the Defendants with proper notice of the nature of the particular claim(s) asserted against them.

moving party. *See Phillips,* 515 F.3d at 234.  But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  Thus, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. *Id.*

Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).[6] With this framework in mind, the Court turns now to Defendants' motions.

## DISCUSSION

### A.    Count One—§ 1983 Excessive Force Claim Against Officer Esposito

Defendant Officer Esposito moves to dismiss Plaintiffs' § 1983 excessive force claim on the basis that: (1) it fails to state a claim, and (2) in any event, he is entitled to qualified immunity.

42 U.S.C. § 1983 provides a civil action for the deprivation of rights against:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

---

[6] Thus, the Court declines to consider the documents attached to Plaintiffs' opposition brief in assessing whether Plaintiffs have met their burden of **pleading** "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must allege that "the defendant acted under color of state law to deprive the plaintiff of a right secured by the Constitution." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).  Here, the parties do not dispute that Defendant Officer Esposito was acting under the color of state law as an officer of the ECSO.  At issue is whether Defendant Officer Esposito used excessive force against Mr. Gaymon when he shot him and, thereby, deprived Mr. Gaymon of his Fourth Amendment right to be free from unreasonable seizure.  *See generally Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.").

To allege a § 1983 claim for the use of excessive force, deadly or not, a plaintiff must show that a "seizure" occurred, and that said seizure was unreasonable.  *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quotation and citation omitted).  The Supreme Court has held that the use of deadly force, "[w]here the suspect poses no immediate threat to the officer and no threat to others," is not justified.  *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  Still, "[w]here the officer has probable cause to believe that the suspect poses a threat of physical harm, either to the officer or to others," deadly force may be justified.  *Id.*

Further, when the excessive force alleged occurred in the course of an arrest, investigatory stop, or other "seizure" of a free citizen, the test of "reasonableness" used by the Court requires an assessment, under the totality of the circumstances, of whether an "officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations."  *Graham*, 490 U.S. at 395-97.  The

"reasonableness" test thus involves "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id.* at 396-97 (internal quotations omitted).  Evaluating the objective reasonableness of the police conduct "requires careful attention to the facts and circumstances of each particular case including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  Further, a court may consider "the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Kopec*, 361 F.3d at 777 (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)).  The Third Circuit has cautioned, however, that "reasonableness" under the Fourth Amendment "should frequently remain a question for the jury." *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999) ("[S]ince we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared.").

The crux of Defendant Officer Esposito's motion to dismiss Plaintiffs' § 1983 excessive force claim is that Plaintiffs' Second Amended Complaint fails to allege enough details about the encounter between Defendant Officer Esposito and Mr. Gaymon.  Defendant Officer Esposito asserts that without such allegations this Court cannot properly determine the plausibility of Plaintiffs' § 1983 claim.

Plaintiffs' Second Amended Complaint alleges that Defendant Officer Esposito encountered Mr. Gaymon in Branch Brook Park and chased him to a pond that prevented his

escape.  It is further alleged that Mr. Gaymon was unarmed and down on his knees with the pond in front of him when Defendant Officer Esposito shot him from behind.  Plaintiffs' Second Amended Complaint does not, however, explain *why* Defendant Officer Esposito chased Mr. Gaymon to the pond.  Generally speaking, absent such context, Plaintiffs' Second Amended Complaint does not state a claim of excessive force that is plausible on its face since it does not allege "the severity of the crime at issue"—a fact essential to assessing reasonableness under the Fourth Amendment.  *Graham*, 490 U.S. at 396.  As a practical matter, however, the Court notes that Plaintiffs have indicated their intent to include the following sentence in a proposed Third Amended Complaint:  "During the encounter, Officer Esposito believed that decedent Gaymon engaged in a lewd, non-violent disorderly persons offense."  (Pl. Opp'n Br. at 9, n. 1, Docket Entry No. 77).  This statement was inferred and relied on by the Court in its March 29, 2012 Opinion based largely on the factual allegations set forth in Count Five of Plaintiffs' original complaint.  *See* Docket Entry No. 1.  Plaintiffs now represent that said statement was inadvertently omitted from the Second Amended Complaint because they have since withdrawn Count Five of the original complaint.  The Court hereby finds that, with the addition of said statement, Plaintiffs' Third Amended Complaint would state a plausible § 1983 excessive force claim for the reasons already provided in the Court's prior opinion in this matter:

> Assuming the facts of Plaintiffs' Complaint to be true, as this Court must, we find that Plaintiffs have sufficiently pled the use of excessive force.  Defendants do not contest that a seizure occurred, but they do contest whether the alleged "altercation" with, "chase," or shooting of the Decedent was "not reasonable and necessary under the circumstances." (Defs. Br., at 12).  It is probable, based on the facts as pled, that the use of deadly force lacked probable cause and the seizure of the Decedent was unreasonable. Considering the requisite factors as laid out in *Graham*, the Complaint alleges that the Decedent was at worst in violation of a city ordinance prohibiting lewd conduct, activity which has not been deemed violent or felonious crime.  (Compl., First Count, ¶ 4;

Fifth Count , ¶¶ 1-4).   Further, accepting the facts pled to be true, Decedent did not appear to pose an immediate threat to the safety of the officers or others as he was unarmed.   (Compl., ¶ 15). While there is some evidence that could lead the Court to infer that the Decedent was attempting to evade arrest by flight, the Court finds the Supreme Court's finding in *Tennessee v. Garner* dispositive in its determination that, even in the context of fleeing felony suspects, "[t]he use of deadly force to prevent the[ir] escape . . ., whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of force to do so.  It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect.  A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  *Garner,* 471 U.S. at 11; *see also In re City of Philadelphia Litig*., 49 F.3d 945, 970-71 (3d Cir. 1995).  In assessing all of the relevant factors—that the Decedent was not engaged in a violent crime, that he was unarmed, and that the police used deadly force—the Court finds that Plaintiffs' have sufficiently alleged a plausible § 1983 claim of excessive force.

*Gaymon v. Esposito*, No. 11-4170, 2012 WL 1068750, *4 (D.N.J. Mar. 29, 2012).   Again, although the Second Amended Complaint does not contain this statement—that Officer Esposito believed that Mr. Gaymon was engaged in a lewd, non-violent disorderly persons offense— this statement was generally contained in Plaintiffs' original complaint and relied upon by the Court in its March 2012 Opinion; thus, in the interest of judicial economy, the Court will assume, for purposes of this motion, that the operative complaint contains said statement.[7]  With the addition of this fact, Plaintiffs have stated a plausible claim of excessive force under § 1983.  *See, e.g., Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.").

---

[7] Plaintiffs are hereby directed to file an amended version of Count One on or before **September 30, 2013**.  Plaintiffs' failure to do so will result in dismissal of Count One of the Second Amended Complaint.

9

### i.        Qualified Immunity

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "For qualified immunity to attach, an official must demonstrate his conduct was objectively reasonable."  *Id.* at 818–19.  Qualified immunity is unavailable to a defendant government official if plaintiff's complaint meets two prongs:  (1) the facts alleged by plaintiff show the violation of a constitutional right; and (2) the plaintiff's constitutional right was clearly established at the time of the violation.  *Saucier v. Katz*, 533 U.S. 194, 201(2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

As discussed above, Plaintiffs have sufficiently alleged a plausible § 1983 claim of excessive force as against Defendant Officer Esposito—that is, Plaintiffs have sufficiently alleged that Officer Esposito violated Mr. Gaymon's Fourth Amendment rights by using excessive force in restraining/seizing him.  *See Garner*, 471 U.S. at 7 ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person.").  The Court must next determine whether the constitutional right at issue was clearly established at the time of the alleged violation.  For a right to be clearly established for the purposes of qualified immunity, " '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' "  *Wilson v. Layne,* 526 U.S. 603, 615 (1999) (quotations omitted).

When the factual allegations in this case are viewed in Plaintiffs' favor, one can reasonably infer that Mr. Gaymon did not present a danger immediately prior to the fatal shot. As a general matter, it is—and was on the night in question—clearly established that if an individual does not present a danger to the officers present or others, law enforcement officials violate that individual's Fourth Amendment rights by shooting him or her with a firearm. *See Garner*, 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); *see generally Saucier*, 533 U.S. at 201 (indicating that it is clearly established that the use of force greater than objectively reasonable violates the Fourth Amendment).

However, the application of the qualified immunity defense in the special context of excessive force claims under the Fourth Amendment requires an assessment, under the totality of the circumstances, of whether an "officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . ." *Graham*, 490 U.S. at 395-97.  As previously stated, the "reasonableness" test thus involves "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id.* at 396-97 (internal quotations omitted).  This "requires careful attention to the facts and circumstances of each particular case including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see generally Abraham,* 183 F.3d at 290 ("[S]ince we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help

11

ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared.").

Although the Court is mindful that the qualified immunity doctrine should ideally be resolved as early as possible in the litigation,[8] this Court finds that assessing the reasonableness of Officer Esposito's actions, under the totality of the circumstances, is not something that can properly be resolved at the pleading stage.   In other words, there is simply insufficient information before the Court at this stage of the proceedings to make an adequate determination of whether the alleged use of force by Officer Esposito was reasonable under the circumstances, and thus whether he is entitled to qualified immunity.  *See generally Newland v. Reehorst*, 328 Fed. Appx. 788, 791 (3d Cir. 2009) (cautioning that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases."); *see, e.g., Larsen v. Senate of Com. of Pa.,* 154 F.3d 82, 94 (3d Cir. 1998) (declining to find that defendants were entitled to qualified immunity on First Amendment retaliation claims where inquiry could not be conducted without making "factual determinations as to the officials' subjective beliefs and motivations" and noting that resolution on the face of the pleadings was inappropriate); *Doss v. Osty*, No. 10-3497, 2011 WL 2559558, at \*5 (D.N.J. June 27, 2011) (denying motion to dismiss claim of excessive force on qualified immunity grounds and noting that "a decision regarding whether the handcuffing amounted to a

---

[8] *See Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) ("Because qualified immunity bestows immunity from suit, the Supreme Court 'repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' ") (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)); *but see Newland v. Reehorst*, 328 Fed. Appx. 788, 791 (2009) (cautioning that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases.").

violation of Plaintiff's Fourth Amendment rights, and whether it constituted a violation of a 'clearly established' right for qualified immunity purposes, would be premature at this time.").

Defendant Officer Esposito's motion to dismiss Count One of Plaintiffs' Second Amended Complaint is therefore denied.

**B.      Count Two—§ 1983 Claim Based on Failure to Train Against the ECSO and the Supervisory Defendants**

Count Two of the Second Amended Complaint alleges that the ECSO (and/or County of Essex)[9] and the Supervisory Defendants (Sheriff Fontoura, Undersheriff Ryan, Captain Kevin Pascoal, and Sargent P. Corbo) failed to: (a) adequately train Officer Esposito on the use of force in the context of covert operations, and (b) failed to supervise him to ensure that the ECSO's standard operating procedure requiring a minimum of four officers was followed, in violation of § 1983.

In particular, Count Two alleges that: (a) the ECSO and the Supervisory Defendants failed to supervise, train and/or control Officer Esposito to ensure that the ECSO's standard operating procedure requiring a minimum of four (4) officers was followed, (b) said defendants failed to train Officer Esposito on the constitutional use of force in covert, undercover law enforcement operations, (c) said defendants failed to provide the requisite specialized training to Officer Esposito prior to assigning him to the undercover operations, (d) as a result of the ECSO and the Supervisory Defendants failure to properly train, supervise and/or control Officer

---

[9] To the extent this claim is asserted against the ECSO (and/or County of Essex), the Court finds that it is more appropriately considered in conjunction with Count Three, which asserts a *Monell* claim against the County of Essex, inasmuch as both claims are premised on the theory that action pursuant to official municipal policy caused the deprivation of a constitutional right. Plaintiffs' own briefing confirms that Counts Three and Two (to the extent that they are asserted against the ECSO and/or County of Essex) are largely overlapping. *See* Docket Entry No. 77 ("Table of Contents").

Esposito and/or failure to ensure that ECSO's standard operating procedure with respect to staffing the undercover quality of life detail was followed, excessive force was used against Mr. Gaymon, which resulted in his death.

As previously stated, § 1983 does not create substantive rights, but rather provides a remedy for the violation of rights created by federal law. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). As a general matter, to state a prima facie case under § 1983, a plaintiff must demonstrate that: (1) the alleged wrongful conduct was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000). Both elements must be met to sustain a claim.

Since Plaintiffs sue the Supervisory Defendants in their individual and official capacities, the Court will consider the sufficiency of Plaintiffs' pleadings with respect to each.

### i.      Supervisory Liability for Failure to Train: Defendants Fontoura, Ryan, Corbo and Pascoal in their Official Capacities

The Supervisory Defendants argue that Plaintiffs' § 1983 claims against them in their official capacities should be dismissed. This Court agrees. The United States Supreme Court has made clear that suits against state government officials in their official capacities should be treated as suits against the state itself. *See Hafer v. Melo*, 502 U.S. 21, 25-27 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."). It is well established that "a state is not a 'person' within the meaning of § 1983." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989). Although "state officials literally are persons," they are not " 'persons under § 1983" and cannot be sued under the statute. *Id.* at 71;

14

*Hafer,* 502 U.S. at 25-27 ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them.").   Plaintiffs do not dispute this.[10]   Accordingly, the § 1983 claims asserted against Defendants Fontoura, Ryan, Corbo and Pascoal in their official capacities are dismissed *with* prejudice.  *See, e.g., Bayete v. Ricci,* 489 Fed. Appx. 540, 542 (3d Cir. 2012) ("The Eleventh Amendment bars federal suits for damages against state officers in their official capacities.  Moreover, state officers sued in their official capacities for money damages are not 'persons' within the meaning of Section 1983. Consequently, the District Court correctly dismissed Bay-e-te's complaint against defendants in their official capacities.") (citations omitted).

### ii.    Supervisory Liability for Failure to Train: Defendants Fontoura, Ryan, Corbo and Pascoal in their Individual Capacities

The Supervisory Defendants also seek dismissal of the § 1983 claims asserted against them in their individual capacities, arguing that: (a) after *Iqbal*, there is no supervisory liability for failure to train or supervise, and, in any event, (b) the allegations set forth in the Second Amended Complaint concerning failure to train and/or supervise are not sufficient to establish that these defendants were personally involved in the alleged wrongful conduct, (c) Plaintiffs fail to allege any specific training failure, pattern of unconstitutional conduct or training that is obviously necessary to avoid constitutional violations, and (d) Plaintiffs cannot state a claim of alleged constitutional violation based on a claimed departure from an internal protocol.

---

[10] *See* Pl. Opp'n Br. at 21 n. 3, Docket Entry No. 77.

<u>Iqbal</u>

As a threshold matter, the Supervisory Defendants urge the Court to dismiss Count Two—which is admittedly based on the ECSO and the Supervisory Defendants' alleged failure to supervise, train and/or control Defendant Officer Esposito—on the basis that *Iqbal* eliminated supervisory liability for failure to train and/or supervise.  In *Iqbal*, the United States Supreme Court held that "[i]n a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677.  Since then, the Court of Appeals for the Third Circuit has "expressed uncertainty as to the viability and scope of supervisory liability after *Iqbal*." *Santiago v. Warminster Twp*., 629 F.3d 121, 130 (3d Cir. 2010); *Argueta v. U.S. Immigration and Customs Enforcement*, 643 F.3d 60, 70 (3d Cir. 2011) (same).  Based on the reasons that follow, the Court need not resolve this uncertainty because, even assuming that *Iqbal* did not eliminate the concept of supervisory liability in its entirety, Plaintiffs have, in any event, failed to allege a plausible claim to relief on the basis of the supervisors' "knowledge and acquiescence" or any other similar theory of liability that existed pre-*Iqbal*.


The Court begins its discussion by noting that there are generally two theories of supervisory liability that are applicable to the facts alleged in this case: (a) the Supervisory Defendants' role in establishing, with deliberate indifference to the consequences, a policy, practice or custom which directly caused the constitutional harm, and (b) the Supervisory Defendants' actual participation in the conduct giving rise to the alleged constitutional violation. The Court will address each, in turn.

16

<u>Deliberate Indifference</u>

"Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.' " *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.,* 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 725 (3d Cir. 1989)).

Plaintiffs do not allege that the Supervisory Defendants actually adopted a facially unconstitutional policy or practice.  For instance, Plaintiffs do not allege that any of the Supervisory Defendants routinely ordered officers to use deadly force to prevent the escape of an unarmed or nondangerous suspect.   Nor does the Second Amended Complaint allege, with sufficient factual support, that any of the Supervising Defendants *personally* maintained a policy or practice of reckless indifference to instances of known use of excessive force in undercover operations.  Beyond alleging generally that the Supervisory Defendants were responsible for creating and/or implementing standard operating procedures for undercover quality of life patrol operations, and that the Supervisory Defendants engaged in a pattern of violating their own standard operating procedure requiring a minimum of four officers to carry out undercover quality of life details,[11] Plaintiffs do not advance any specific allegations against any of the Supervisory Defendants.  Certainly, Plaintiffs have failed to allege sufficient <u>facts</u> showing that any particular policy, procedure, or practice implemented by any of the Supervisory Defendants—through their own, individual actions—directly caused the constitutional harm at issue. *See generally Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's

---

[11] *See* Sec. Am. Compl., ¶¶ 9-12; 31-32.

own individual actions, has violated the Constitution."). Plaintiffs have, therefore, failed to state a plausible claim of supervisory liability for failure to train premised on this theory.

Personal Involvement

A supervisor may also be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M.,* 372 F.3d at 586; *see also Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."); *see, e.g., Brown v. Grabowski*, 922 F.2d 1097, 1120 (3d Cir. 1990) (reversing denial of summary judgment as to Chief of Police in his individual capacity where "Plaintiff . . . supplied no evidence [that he] . . . directed or affirmatively participated in any of the actions claimed to have deprived Evans of her constitutional rights and, ultimately, her life.").

The Court agrees with the Supervisory Defendants that the Second Amended Complaint does not allege that any of the Supervisory Defendants were personally involved in Officer Esposito's alleged use of excessive force on the night in question. In other words, the Second Amended Complaint does not allege that any of the Supervisory Defendants participated in the use of force or actually directed the use of force that allegedly resulted in the constitutional violation at issue.

To the extent the Second Amended Complaint should be construed as alleging that the Supervisory Defendants' collective practice of failing to train their employees as to the proper protocols could give rise to supervisory liability as to the Supervisory Defendants in their individual capacities, Plaintiffs do not identify in their pleading any specific actions taken by any

of the Supervisory Defendants, or what exactly the Supervisory Defendants should have done differently, "whether with respect to specific training programs or other matters, that would have prevented the unconstitutional conduct." *Argueta*, 643 F.3d at 75; *see, e.g., Beers–Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001). Moreover, such theory—in the absence of facts concerning specific actions by each of the Supervisory Defendants—"improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008) (dismissing claims against individual supervisors where plaintiff had failed to advance any specific allegations against them and noting that "while an individual supervisor may still be held liable in his or her individual capacity under a failure-to-train theory, the Estate must point to a specific action of each individual supervisor to defeat a qualified immunity claim."). Plaintiffs' allegations that officers in undercover operations, including Office Esposito, were not properly trained—to follow the ECSO's standard operating procedures *or* on the constitutional limits of the use of deadly force—are more appropriately asserted against the municipality itself, and not against the Supervisory Defendants in their individual capacities. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (recognizing that a systematic failure to adequately train officers as a custom or policy may lead to municipal liability); *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) ("Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the ***city*** may be deemed deliberately indifferent if the policymakers choose to retain that program.") (emphasis added).

Thus, because the Second Amended Complaint does not allege that the Supervisory Defendants actually adopted a policy or practice which directly caused the constitutional harm,

or that any of the Supervisory Defendants personally directed Officer Esposito's alleged use of excessive force,[12] in order to state a viable claim of supervisory liability (for failure to train) as against the Supervisory Defendants in their individual capacities,[13] the Second Amended Complaint *must* allege—as a threshold matter, and with sufficient factual support—that each of the Supervisory Defendants had actual knowledge of and acquiescence in the alleged constitutional violation in order to state a viable § 1983 claim as against the Supervisory Defendants. *See Rode,* 845 F.2d at 1207 ("Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.").

<u>Knowledge and Acquiescence</u>

In order to properly allege supervisory liability under a knowledge and acquiescence theory, Plaintiffs *must* allege that each of the Supervisory Defendants had "contemporaneous, personal knowledge" of Officer Esposito's alleged use of excessive force and acquiesced in it. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (dismissing supervisory liability claim against individual government defendant where the operative complaint "did not allege any facts indicating that Attorney General Fisher personally directed her transfer [or that] . . . . Attorney General Fisher had contemporaneous, personal knowledge of her transfer and acquiesced in it.").

---

[12] *See Rode,* 845 F.2d at 1207 ("Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.").

[13] *See Stoneking*, 882 F.2d at 724-725 ("[S]he argues defendants are liable because of their own actions in adopting and maintaining a practice, custom or policy of reckless indifference to instances of known or suspected sexual abuse of students by teachers, in concealing complaints of abuse, and in discouraging students' complaints about such conduct. . . . Thus, this is not *respondeat superior* in another guise, but an assertion of liability against the individual defendants based on theories recognized in a line of Supreme Court cases.").

Moreover, "[a]llegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity." *Rode*, 845 F.2d at 1207-1208.

The Second Amended Complaint alleges that Sheriff Armando Fontoura "had the ultimate authority to implement and oversee ECSO undercover patrol operations conducted in Essex County parks and [to] ensure that ECSO standard operating procedures with respect to the undercover quality of life details were followed." (Sec. Am. Compl., ¶ 9).  It is further alleged that Undersheriff Kevin Ryan was "responsible for creating and implementing standard operating procedures for undercover quality of life patrol operations as well as the overall training, conduct, and supervision of ECSO Sheriff's Officers." (*Id.*, ¶ 10).  According to the Second Amended Complaint, Captain Kevin Pascoal was also "responsible for creating and implementing standard operating procedures for undercover quality of life patrol operations as well as the overall training, conduct, and supervision of ECSO Sheriff's Officers to ensure compliance with the undercover quality of life standard operating procedures as well as the rules and regulations of the ECSO and the Attorney General Guidelines with respect to the use of deadly force." (*Id.*, ¶ 11).  Sergeant Peter Corbo was responsible for supervising quality of life undercover patrol operations in Essex County parks, including the detail in Branch Brook Park on July 16, 2010." (*Id.*, ¶ 12).   Plaintiffs allege, generally, that said Supervisory Defendants "failed to adequately train Defendant Esposito concerning the ECSO's standard operating procedures as well as the constitutional use of force in covert, undercover operations." (*Id.*, ¶ 33).  Plaintiffs also allege that the Supervisory Defendants failed to provide Officer Esposito with the necessary "specialized training" that was "obviously necessary to avoid violating a suspect's constitutional rights." (*Id.*, Count Two, ¶¶ 4-6).

Notwithstanding the foregoing allegations—which, as previously stated, are more appropriately asserted against the municipality [14]—the Second Amended Complaint fails to contain any facts, whatsoever, in support of the theory that any of the Supervisory Defendants were aware of and disregarded an excessive risk of harm to Mr. Gaymon on the night in question. *See, e.g., Wesley v. Varand*, 505 Fed. Appx. 91, 94 (3d Cir. 2012) (affirming dismissal of § 1983 claim of improper training and supervision against supervisors and noting that "Wesley claimed that there was improper training and supervision of the food service personnel, but he did not point to any facts suggesting the Defendants were aware of and disregarded an excessive or substantial risk of harm to him."). The Second Amended Complaint does not allege that any of the Supervisory Defendants personally directed Officer Esposito to conduct the undercover operation in a manner that they knew or reasonably should have known would cause Officer Esposito to deprive Mr. Gaymon of his constitutional rights. There are no facts in the Second Amended Complaint to suggest, much less show, that excessive force was used on anyone other than Mr. Gaymon on the night in question. *See, e.g., Santiago v. Warminster Twp*., 629 F.3d 121, 133 (3d Cir. 2010) ("Where, as here, an operation results in the use of allegedly excessive force against only one of several people, that use of force does not, by itself, give rise to a plausible claim for supervisory liability against those who planned the operation. To hold otherwise would allow a plaintiff to pursue a supervisory liability claim anytime a planned operation resulted in excessive force, merely by describing the force used and appending the phrase 'and the Chief told them to do it.' *Iqbal* requires more."). Rather, it is clear that each

---

[14] *See, e.g., Connick*, 131 S. Ct. at 1360 ("Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the **city** may be deemed deliberately indifferent if the policymakers choose to retain that program.") (emphasis added).

allegation made against each of the Supervisory Defendants merely corresponds to that individual's title, and not to their alleged *personal* misconduct.

Thus, Plaintiffs have failed to allege a plausible § 1983 supervisory liability claim as against the Supervisory Defendants in their individual capacities inasmuch as the Second Amended Complaint fails to contain sufficient facts showing that the Supervisory Defendants: (a) with deliberate indifference to the consequences, actually adopted a policy or practice which directly resulted in Officer Esposito's alleged use of excessive force on Mr. Gaymon, (b) were personally involved in Officer Esposito's alleged use of excessive force, or (c) had contemporaneous, personal knowledge of Officer Esposito's alleged use of excessive force (or even personal knowledge that an excessive risk of harm to Mr. Gaymon existed on the night in question), and nevertheless acquiesced in it.   Simply put, Plaintiffs have failed to state a viable § 1983 claim (for failure to train) as against the Supervisory Defendants, in their individual capacities, because the Second Amended Complaint fails to allege facts that, if proven, would show Defendants Fontoura, Ryan, Corbo and/or Pascoal's personal involvement in Officer Esposito's alleged use of excessive force on the night in question.  *See Rode,* 845 F.2d at 1207 (holding that an individual defendant in a civil rights action, including the Governor, "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*" and noting that "Rode's assertion that the Governor had 'responsibility for supervising' the other defendants is irrelevant.").

In the alternative, the Court concludes that Plaintiffs' failure to plead substantive facts about the Supervisory Defendants' individual misconduct or personal involvement in the alleged misconduct not only renders their supervisory liability claims deficient pursuant to pre-*Iqbal* standards, but it also renders their claim deficient as a matter of law under the *Iqbal* holding,

23

itself.[15]  *See Iqbal*, 556 U.S. at 677 ("[E]ach government official, his or her title notwithstanding, is only liable for his or her own misconduct.").  At most, Plaintiffs allege that the ECSO, through its high-ranking officials, had a pattern or practice of failing to train and/or supervise its subordinates.  Such allegations, without more, do not establish *individual* liability under section 1983 for failure to train pursuant to *Iqbal*.   *See id*. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own <u>individual</u> actions, has violated the Constitution.") (emphasis added).  Thus, even if Plaintiffs' supervisory liability claim had succeeded in meeting the pre-*Iqbal* pleading requirements, it would in any event fail under *Iqbal*.

Having found that Plaintiffs have failed to state a viable claim of failure to train and/or supervise under § 1983 as to the Supervisory Defendants in their individual and/or official capacities, the Court need not reach the issue of whether the Supervisory Defendants would be entitled to qualified immunity.[16]   Defendants' motion to dismiss Count Two of Plaintiffs' Second Amended Complaint is granted.  Having previously discussed, at length, the pleading deficiencies in this claim,[17] and having already afforded Plaintiffs with an opportunity to replead

---

[15] Again, the Court does not reach the issue of whether *Iqbal* eliminated the concept of supervisory liability, in its entirety.  *See, e.g., Santiago*, 629 F.3d at 130; *Argueta*, 643 F.3d at 70.

[16] It is unclear whether this Court's finding should result in a dismissal of Plaintiffs' § 1983 claim as against the Supervisory Defendants based on Plaintiffs' failure to establish a cause of action under section 1983 or based on qualified immunity.  *See Wright v. City of Philadelphia*, 409 F.3d 595, 600 (3d Cir. 2005).  The Third Circuit admittedly has been inconsistent on this issue.  *See id.*  However, the Third Circuit emphasized that "[a]s a practical matter, the outcome will be the same whether we conclude that the officers are immune from suit or instead, that the plaintiff has no cause of action." *Id.*

[17] In particular, the Court previously held:

this claim,[18] the Court finds that any future amendment of this claim would be futile.  Count Two

of Plaintiffs' Second Amended Complaint is thus dismissed *with* prejudice.

**C.    Count Three—§ 1983 Claim Based on Failure to Train and Follow ECSO Standard Operating Procedure Against County of Essex**

Plaintiffs seek to impose municipal liability on the ECSO and/or County of Essex based

on two theories: (1) failure to train (set forth in Count Two), and (2) failure to follow their own

standard operating procedures (set forth in Count Three).   The Court will address each theory, in

turn.

**i.    Failure to Train**

Plaintiffs allege that the ECSO and/or County of Essex "were negligent and otherwise

reckless in that they failed to adequately train, supervise, and/or properly control Defendant

Esposito who unlawfully and unconstitutionally used excessive and deadly force against [Mr.

Gaymon.  Defendants . . . failed to train Defendant Esposito on the constitutional use of force in

covert, undercover law enforcement operations . . . [and] failed to provide the requisite

---

> To the extent that Plaintiffs allege that the Supervisory Defendants
> are liable in their individual capacities for failing to supervise
> and/or control Defendant Esposito, the Court finds the factual
> allegations insufficient to support such a claim.  As stated infra, the
> Complaint fails to allege any facts relaying any information about
> Defendants Fontoura and Ryan's whereabouts and awareness when
> the alleged injury occurred, namely the fatal shooting of the
> Decedent by Officer Esposito.  The Complaint thus does not state
> any facts which support their personal involvement in the alleged
> injury, nor are there any facts alleged supporting their actual
> knowledge and acquiescence in Defendant Esposito's use of
> deadly force.

*See* March 29, 2012 Opinion at 19.

[18] In fact, since the Court's March 29, 2012 Opinion, Plaintiffs have amended their complaint *twice*.  *See* Docket Entry Nos. 30, 67.

specialized training to Defendant Esposito prior to assigning him to the undercover operations."

(Sec. Am. Compl., Count Two, ¶ 3).  It is further alleged that "specialized training on the

constitutional limits of the use of deadly force is required for law enforcement officers engaged

in covert, undercover operations because the nature of the operations creates a unique

environment where a supervisor's failure to adequately train a subordinate undercover officer

would cause the use of excessive force." (*Id.*, ¶ 5).  "Specialized training" is described as "a

recognized standard for law enforcement officers provided by other law enforcement agencies to

officers participating in covert, undercover operations." (*Id.*).  Despite the need for such

"specialized training," the Second Amended Complaint alleges that "Defendant Esposito only

received basic firearms training for uniformed officers." (*Id.*, ¶ 4).

    This Court previously held, in pertinent part, as follows:

> To establish § 1983 liability for failure to train, a plaintiff must
> show specific training deficiencies and either (1) a pattern of
> constitutional violations of which policy-making officials can be
> charged with knowledge, or (2) that training is obviously necessary
> to avoid constitutional violations.  *City of Canton v. Harris*, 489
> U.S. 378, 390 (1989).  A municipality may be held liable for its
> failure to train employees only where that failure amounts to
> "deliberate indifference to the [constitutional] rights of persons
> with whom the police come in contact."  *Id.*, at 388; *see also*
> *Woloszyn v. County of Lawrence*, 396 F.3d 314, 324 (3d Cir.
> 2005); *Doe v. Luzerne Cty.*, 660 F.3d 169, 179 (3d Cir. 2011).
> Deliberate indifference is a stringent standard of fault "requiring
> proof that a municipal actor disregarded a known or obvious
> consequence of his action."  *Connick v. Thompson*, 131 S. Ct.
> 1350, 1359 (2011) (*quoting Bryan Cty. v. Brown*, 520 U.S. 397,
> 410 (1997)).  There are two means of finding such deliberate
> indifference in a failure to train claim: (1) through a pattern of
> similar constitutional violations providing a municipal actor with
> notice; and (2) "single-incident" liability as developed doctrinally
> in the Supreme Court's decisions in *City of Canton v. Harris* and
> *Connick v. Thompson*.
>
> In general, a plaintiff must establish deliberate indifference in
> accordance with the first means—a pattern of similar constitutional

26

violations—in order to establish a failure to train claim: "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*, at 1360 (citing *Bryan Cty.*, 520 U.S. at 409). Therefore, to determine if an alleged failure to train amounts to a "deliberate" or "conscious" choice, a plaintiff must show that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Luzerne Cty.*, 660 F.3d at 179 (*quoting Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (citation omitted)). Further, causation between the noticed training deficiency and the injury must be shown: "'for liability to attach in this circumstance the identified deficiency must be closely related to the ultimate injury,' . . . meaning that the plaintiff must 'prove that the deficiency in training actually caused [the constitutional violation at issue].'" *Id.* (citations omitted).

In "'a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference. . . . [For] example [if] a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Connick*, 131 S. Ct. at 1361 (citing *Canton*, 489 U.S. at 390 n. 10). In such circumstances, deliberate indifference may be established through "single-incident" liability. *Id.* The Supreme Court in *Canton* stated that, "[g]iven the known frequency with which police attempt to arrest fleeing felons and the 'predictability that an officer lacking specific tools to handle that situation will violate citizens' rights,' the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights." *Id.* (*citing Bryan Cty.*, 520 U.S. at 409). To show deliberate indifference in this narrow range of circumstances, a plaintiff would have to show that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for

which the city is responsible, and for which the city may be held liable if it actually causes injury." *Canton*, 489 U.S. at 390.  A "single incident of unconstitutional activity" is generally insufficient to make out a claim unless there is proof that the incident "can be attributed to a municipal policymaker."  *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (1985); *see also Luzerne Cty.*, 660 F.3d at 180.

The Court finds that Plaintiffs fail to allege supervisory liability for ECSO's failure to train Officer Esposito since they fail to state facts supporting their deliberate indifference based either on a pattern of constitutional violations of which they had notice or on a "single-incident" liability theory.  First and foremost, Plaintiffs cite to no facts detailing specific deficiencies in training programs provided by ECSO and the Supervisory Defendants.  Failure to so allege is thus fatal to Plaintiffs instant claim.  However, even if Plaintiffs were to so allege specific deficiencies, the Complaint, as stated *infra*, alleges no facts pointing to prior instances of the disproportionate use of deadly force so as to provide ECSO and the Supervisory Defendants with notice concerning the training deficiencies.  Instead, it appears based on Plaintiffs' Opposition brief, that they intend to rely on the single instance of Officer Esposito's use of deadly force: "Defendants' deliberate indifference to individuals' constitutional rights is evidenced by their placing an untrained and unsupervised Defendant Esposito, armed with a revolver, in an undercover operation in a public park where Defendants['] failure to train Esposito 'in the constitutional limitations on the use of deadly force' resulted in the tragic death of Defarra Gaymon." (Pls. Opp'n Br., at 14).

In its most recent consideration of "single-incident" liability for a § 1983 failure to train claim, the Supreme Court in *Connick* found that a failure to train prosecutors in their obligations to provide exculpatory evidence to defendants under *Brady v. Maryland* "does not fall within the narrow range of *Canton's* hypothesized single-incident liability." *Connick*, 131 S. Ct. at 1361.  The Court distinguished the deficiencies of prosecutorial training from failure to train claims asserted against police officers as follows:
Armed police must sometimes make split-second decisions with life-or-death consequences.  There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force.  And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require.  Under those circumstances there is an obvious need for some form of training.  In stark contrast, legal "[t]raining is what differentiates attorneys from average public

employees."  Attorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment. . . . In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the "obvious consequence" of failing to provide prosecutors with formal in-house training about how to obey the law.

Id. at 1361-62 (citations omitted).  Connick thus strongly supports the need for police training in the constitutional limits of the use of deadly force.  However, even assuming that the need for such training in this case was as obvious as under the facts alluded to in Connick and as stated in Canton, there are no facts in Plaintiffs' Complaint that allege anything whatsoever about the nature and extent of training on the part of ECSO regarding the constitutional limits of the use of deadly force with its police officers.  Plaintiffs make no factual allegations in their Complaint regarding training, or more specifically, facts regarding the existence or lack thereof of a training program for Essex County police officers, the nature of the deficiencies of said program, for example in light of comparators such as training given by other municipalities or counties in handling weapons in public spaces or recognized standards for training police officers in such areas.  Given that a municipality's culpability for a deprivation of rights "is at its most tenuous where a claim turns on a failure to train," this Court finds that, given the limited factual support for Plaintiffs' failure to train claim, it cannot survive a motion for judgment on the pleadings. See  Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell.").

(March 29, 2012 Opinion).

Having carefully reviewed the Second Amended Complaint, the Court finds that Plaintiffs have failed to cure the pleading deficiencies addressed by the Court in its March 29, 2012 Opinion.    In particular, the Second Amended Complaint contains no facts detailing specific deficiencies in training programs provided by the ECSO.   As the Court previously stated, failure to do so is fatal to Plaintiffs' § 1983 failure to train claim.  Moreover, the Second Amended Complaint alleges no facts pointing to prior instances of the disproportionate use of

deadly force so as to provide the ECSO with notice concerning any training deficiencies.  *See generally Connick,* 131 S. Ct. at 1360 ("Without notice that a course of training is deficient, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."); *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1064-1065 (3d. Cir. 1991) ("As a predicate to establishing her concomitant theory that the City violated Simmons's rights by means of a deliberately indifferent failure to train, plaintiff must similarly have shown that such policymakers, likewise knowing of the number of suicides in City lockups, either deliberately chose not to provide officers with training in suicide prevention or acquiesced in a longstanding practice or custom of providing no training in this area.").

Plaintiffs allege that the ECSO failed to provide "the requisite specialized training" to Defendant Officer Esposito.  But Plaintiffs' Second Amended Complaint contains no facts to substantiate this theory.  For instance, Plaintiffs still make no factual allegations regarding the nature of the deficiencies of the training program for Essex County police officers, for example, in light of comparators—such as training in handling weapons in public spaces given by other particular municipalities, or recognized standards for training police officers in such areas. Similarly, Plaintiffs describe such "specialized training" as "a recognized standard for law enforcement officers provided by other law enforcement agencies to officers participating in covert, undercover operations."  However, Plaintiffs' Second Amended Complaint provides no *facts*, whatsoever, to support or even provide proper context for this statement.  Thus, this statement is conclusory and does not benefit from the presumption of truth.  *See generally Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Absent the type of factual content already referenced—*at length*—by the Court in its March 29, 2012 Opinion, Plaintiffs have failed to allege a facially plausible § 1983 claim for failure to train as against the ECSO.[19]  *See generally Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").   Having already afforded Plaintiffs with an opportunity to cure the pleading deficiencies in this claim,[20] the Court finds that any amendment of this claim would be futile.  Thus, this aspect of Plaintiffs' § 1983 claim as against the ECSO and/or County of Essex is now dismissed *with* prejudice.

### ii.      Failure to Follow Standard Operating Procedures

Count Three alleges that the County of Essex, through its law enforcement arm, the ECSO, had a policy in place requiring its undercover quality of life details to be staffed with at least four (4) officers.  According to Plaintiffs, "Defendant County of Essex's *Monell* liability arises from its custom of violating its internal staffing policy." (Pl. Opp'n Br. at 22, Docket Entry No. 77).  Such custom, or course of conduct on the part of the County of Essex, allegedly resulted in the deprivation of Mr. Gaymon's constitutional rights.

A municipality may incur liability under § 1983 only when its policy or custom causes a particular constitutional violation.  *See Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a

---

[19] Plaintiffs do not appear to oppose dismissal of this aspect of their § 1983 claim against the County of Essex.  *See* Docket Entry No. 77 at I ("Table of Contents").

[20] In fact, as previously stated, since the Court's March 29, 2012 Opinion, Plaintiffs have amended their complaint *twice*.  *See* Docket Entry Nos. 30, 67.

shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."
*City of Canton,* 489 U.S. at 389.  When a single decision is the basis of the alleged constitutional violation, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-484 (1986).  The Third Circuit has made clear, however, that "a mere showing that a particular officer violated policy, or that better training would have enabled the officer to avoid the injury-causing conduct, is insufficient to establish a municipality's liability under § 1983 for failure to train." *Simmons v. City of Phila*., 947 F.2d 1042, 1060 (3d Cir. 1991).

Count Three alleges that: (a) at all relevant time, the ECSO had a standard operating procedure requiring that "[w]hen a plain clothes/undercover detail are [sic] being conducted a minimum of (4) Officers are utilized for the detail.  When manpower dictates, and additional officers are available, additional officers are utilized to conduct the quality of life details." (Sec. Am. Compl., Count Three, ¶ 2), (b) the ECSO undercover quality of life detail at issue was in violation of the ECSO standard operating procedure because only two sheriff's officers were assigned to the detail (*Id*., ¶ 3), and (c) the ECSO's violation of the internal ECSO policy led directly to the constitutional violations inflicted upon Mr. Gaymon on the night in question (*Id*., ¶ 7).

Thus, the crux of Plaintiffs' *Monell* claim, as laid out in the Second Amended Complaint, is that: (a) on the night in question, the ECSO had a formal policy in place requiring its undercover quality of life details to be staffed with at least four (4) officers, and (b) Defendants ECSO and/or County of Essex were negligent and/or reckless "in that they ordered the July 16,

2012 quality of life detail in Branch Brook Park to proceed with only two officers in violation of the ECSO standard operating procedure . . ." (Sec. Am. Compl., Count Three, ¶ 5).  At most, such allegations demonstrate that there was a formal quality of life detail staffing policy in place and that, on the night in question, Officer Esposito and/or an undisclosed supervisory official who ordered the detail to proceed with only two officers did not adhere to the policy.

The Court declines to rule on whether such allegations, alone, would state a viable *Monell* claim against the County of Essex because it is clear from Plaintiffs' submissions that Plaintiffs wish to substantiate this particular claim with an additional set of facts that are not currently set forth in the Second Amended Complaint.   For instance, Plaintiffs' brief in opposition to the Supervisory Defendants' motion to dismiss states that:

> Pursuant to a Court Order, the Essex County Prosecutor's Office has also provided ECSO incident and arrest reports for twenty-four (24) undercover Quality of Life Details that Defendant Officer Esposito was assigned to during the two (2) years leading up to [Mr.] Gaymon's tragic death.  The reports confirm that in 2009, with three notable exceptions, the ECSO followed its staffing protocol and assigned at least four officers to the undercover details.  The vast majority of the 2009 arrests involved operations where suspects were 'apprehended without incident.'  On August 18, 2009 and August 19, 2009, however, Defendant Officer Esposito was assigned to Quality of Life Details with less than four officers.  Both of those details involved arrests which became violent and led to the use of pepper spray.  Thereafter, commencing in 2010, the ECSO implemented a custom of violating the . . . Quality of Life Detail staffing policy.  This fact is not conclusory.  It is directly supported by the ECSO incident and arrest reports.  Indeed, while the majority of the Quality of Life Details involved four officers in 2009, not one of the twelve (12) Quality of Life Details that Officer Esposito was assigned to in 2010 had four officers.   Instead, the incident and arrest reports confirm that only two officers were assigned to the details. Employing its judicial experience and common sense . . . the Court is free to draw the reasonable inference that the ECSO Four Officer Standard Operating Procedure with respect to staffing was in place to facilitate arrests where suspects would be 'apprehended without incident,' instead of having Quality of Life Detail arrests

> involving physical force, violence and constitutional violations.  It is highly plausible that the ECSO required at least four (4) officers to be assigned to the Quality of Life Details to achieve this objective.

(Pl. Opp'n Br. at 12-13, Docket Entry No. 77).  In light of the foregoing, Plaintiffs claim that "it is highly plausible that had the ECSO followed its staffing policy on July 16, 2010, [Mr.] Gaymon would still be alive today. *Id*. at 19.

Although the Court declines to rule on this claim in the abstract, the Court finds, as a general matter, that Plaintiffs could state a viable *Monell* claim against the County of Essex if they allege sufficient facts showing that responsible policymakers were aware that understaffing their quality of life details—or, in other words, failing to following their standard operating procedure—historically resulted in an increase of arrests which became violent, and were aware that following their standard operating procedure could prevent the increase in violent arrests, but either deliberately chose not to follow their own standard operating procedure or simply acquiesced in a longstanding custom of inaction in this regard.  *See, e.g., Simmons*, 947 F.2d at 1064 ("In order to establish the City's liability under her theory that Simmons's rights were violated as a result of a municipal policy or custom of deliberate indifference to the serious medical needs of intoxicated and potentially suicidal detainees, plaintiff must have shown that the officials determined by the district court to be the responsible policymakers were aware of the number of suicides in City lockups and of the alternatives for preventing them, but either deliberately chose not to pursue these alternatives or acquiesced in a longstanding policy or custom of inaction in this regard.").

Because a complaint cannot be amended by way of a brief filed in opposition to a motion to dismiss,[21] and because Plaintiffs clearly wish to substantiate this *Monell* claim with an entire set of facts that are not contained in the Second Amended Complaint, the Court will grant Defendants' motion to dismiss this claim.  Since this claim was asserted for the first time in Plaintiffs' Second Amended Complaint, the Court will provide Plaintiffs with an opportunity to replead it with all necessary and relevant facts before ruling on its plausibility.  Count Three of Plaintiffs' Second Amended Complaint is hereby dismissed *without* prejudice.

**D.      Four—Violation of New Jersey Civil Rights Act as Against Officer Esposito[22]**

In addition to bringing claims pursuant to § 1983, Plaintiffs also brings a claim under the New Jersey State Constitution through the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-2, in Count Four of the Second Amended Complaint.  A person may bring a civil action under the NJCRA in two circumstances: "(1) when he's deprived of a right, or (2) when his rights are interfered with by threats, intimidation, coercion or force." *Felicioni v. Administrative Office of Courts*, 404 N.J. Super. 382, 400 (App. Div. 2008). The NJCRA was modeled after § 1983, and thus courts in New Jersey have generally looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011); *see also Chapman v. New Jersey*, No. 08–4130, 2009 WL 2634888, *3 (D.N.J. Aug.2 5, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart. . . ."); *Armstrong v. Sherman*, No. 09–716, 2010 WL 2483911, *5 (D.N.J. June 4,

---

[21] *See Com. of Pa. ex rel v. Zimmerman v. Pepsico*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

[22] The Court hereby construes this Count as being asserted only against Officer Esposito.

2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983. . . ."); *see generally Hedges v. Musco*, 204 F.3d 109, 121 n. 12 (3d Cir. 2000) (concluding New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment).

Count Four of Plaintiffs' Second Amended Complaint alleges that "the unlawful and unconstitutional actions of Defendant Officer Esposito violated [Mr. Gaymon's] State Constitutional rights [as] set forth in paragraph two above as guaranteed by the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, when Officer Esposito used unreasonable, excessive and deadly force by shooting the unarmed [Mr. Gaymon] in the stomach." (Sec. Am. Compl., Count Four, ¶ 3). Paragraph two, in turn, states that "Article I, Paragraph 1 of the New Jersey Constitution guaranteed [Mr. Gaymon] the natural and unalienable rights of enjoying and defending life and pursuing and obtaining safety and happiness.[23] Additionally, Article I, Paragraph 7 ensured [Mr. Gaymon's] right to be free from unreasonable seizures."[24] (*Id.*, ¶ 2).

In support of his motion to dismiss this claim, Defendant Officer Esposito first asserts that claims of excessive force premised on violations of the Fourth Amendment of the United States Constitution are not actionable under the NJCRA. But Plaintiffs' NJCRA claim is not premised on a violation of the Fourth Amendment of the United States Constitution. Rather,

---

[23] Article I, Paragraph 1 of the New Jersey Constitution provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." N.J.S.A. Const. Art. 1, ¶ 1.

[24] Article I, Paragraph 7 of the New Jersey Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized." N.J.S.A. Const. Art. 1, ¶ 7.

36

paragraph 2 of Count Four makes clear that Plaintiffs' NJCRA claim is premised on violations of paragraphs 1 and 7 of Article I of the New Jersey Constitution.  This argument is therefore rejected.

Next, Officer Esposito presents a rather confusing two-part argument: (a) procedural due process claims are not permitted under the NJCRA, and (b) claims of excessive force by police officers during the course of an arrest are not substantive due process claims.   Turning to the first aspect of Officer Esposito's argument, in support of the premise that the NJCRA was intended only for substantive due process claims, Officer Esposito cites to the district court's decision in *Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 405 (D.N.J. 2011) ("The NJCRA was specifically amended to limit the legislation's scope to substantive due process.").   This decision is not only factually distinguishable,[25] but more importantly, does not constitute binding legal authority on matters of New Jersey law.  Certainly, this decision does not address—in any way, shape or form—how claims under the NJCRA, which are premised on a violation of Article I, Paragraphs 1 and/or 7 of the New Jersey Constitution, should be categorized or analyzed.

Turning now to the second aspect of Officer Esposito's argument—that "excessive force claims are claims within the Fourth Amendment's unreasonable search and seizure prohibition and do not fall within a generalized notion of substantive due process"[26]—in support of this position, Officer Esposito cites to the following portion of the *Graham* decision:

> Today we make explicit what was implicit in Garner's analysis, and hold that all claims that law enforcement officers have used

---

[25] *See, e.g., Major Tours*, 799 F. Supp. 2d at 405 ("As with their federal procedural due process claims, it is impossible to identify whether [the deprivation] Plaintiffs are talking about the ticketing of their buses, the impound, the charges for towing, all of these things, or none of these things.").

[26] (Def. Reply Br. at 6).

> excessive force—deadly or not—in the course of an arrest,
> investigatory stop, or other "seizure" of a free citizen should be
> analyzed under the Fourth Amendment and its "reasonableness"
> standard, rather than under a "substantive due process" approach.
> Because the Fourth Amendment provides an explicit textual source
> of constitutional protection against this sort of physically intrusive
> governmental conduct, that Amendment, not the more generalized
> notion of "substantive due process," must be the guide for
> analyzing these claims.

*Graham*, 490 U.S. at 395.  Relying solely on the *Graham* decision, Officer Esposito maintains

that "Plaintiffs cannot turn an excessive force claim into a substantive due process claim by

sifting it through different provisions of the [New Jersey] State Constitution." (Def. Reply Br. at

6).  But Officer Esposito concedes that Plaintiffs' NJCRA claim is based, in part, on paragraph 7

of Article I of the New Jersey Constitution and that "excessive force claims have been

recognized within the rubric of Article I, Paragraph 7 of the New Jersey Constitution." (Def.

Reply Br. at 7); *see, e.g., Hedges*, 204 F.3d at 121 n. 12 ("Having established that there was no

federal constitutional [Fourth Amendment] violation, defendants must also prevail on plaintiffs'

claims under Article I, paragraph 7 of the New Jersey Constitution.").

In *Graham*, the United States Supreme Court held:

> We reject this notion that all excessive force claims brought under
> § 1983 are governed by a single generic standard. As we have said
> many times, § 1983 "is not itself a source of substantive rights,"
> but merely provides "a method for vindicating federal rights
> elsewhere conferred." In addressing an excessive force claim
> brought under § 1983, analysis begins by identifying the specific
> constitutional right allegedly infringed by the challenged
> application of force.  In most instances, that will be either the
> Fourth Amendment's prohibition against unreasonable seizures of
> the person, or the Eighth Amendment's ban on cruel and unusual
> punishments, which are the two primary sources of constitutional
> protection against physically abusive governmental conduct. The
> validity of the claim must then be judged by reference to the
> specific constitutional standard which governs that right, rather
> than to some generalized "excessive force" standard.

*Graham*, 490 U.S. at 393-394 (internal citations omitted).  Defendant Officer Esposito cites to no case law construing the *Graham* decision—which indisputably addresses excessive force claims brought under § 1983—in the context of claims based on a deprivation of rights under the New Jersey Constitution (or any other state constitution).  In other words, Officer Esposito cites to no compelling legal authority in support of the position that the *Graham* decision has the practical effect of precluding a claim under the NJCRA premised on a violation of Article I, Paragraph 1 and/or 7 of the New Jersey Constitution.  While the Court is certainly mindful of the significance of the *Graham* decision, it is not the Court's responsibility to connect the dots between its rather expansive holding as to excessive force claims brought under § 1983 and the premise that such holding precludes a claim under the NJCRA premised on a violation of Article I, Paragraph 1 and/or 7 of the New Jersey Constitution.

Defendant Officer Esposito's motion to dismiss Count Four is therefore denied. Defendant Officer Esposito is free to renew such arguments—with more in-depth legal analysis and citation to proper legal authority—at the summary judgment stage.

**E.      Counts Five and Six—State Law Tort Claims Act Violation**

**i.      Excessive Force, Assault and Battery as Against Defendant Esposito, the ECSO and/or County of Essex**

Count Five alleges a state law claim of excessive force, assault and battery against Defendant Officer Esposito based on his actions on the night in question, and against the ECSO and/or County of Essex under a theory of *respondeat superior*, "for the careless, negligent, and/or reckless acts" of their agent, servant and/or employee, Officer Esposito.  (Sec. Am.

Compl., Count Five, ¶ 5).  Defendants Esposito and the ECSO and/or County of Essex move to dismiss this claim.

Under New Jersey law, "[a] person may be liable for battery if 'he acts intending to cause a harmful or offensive contact . . . or an imminent apprehension of such contact' and a 'harmful' or 'offensive' contact 'directly or indirectly results.' " *Giovine v. Giovine*, 284 N.J. Super. 3, 34 (App. Div. 1995) (citations omitted), *overruled on other grounds, Brennan v. Orban*, 145 N.J. 282 (1996).  "A person who acts with the same intent may be liable for assault even if no contact actually results if the victim is placed in "imminent apprehension" of a harmful or offensive contact." *Id.*

In the context of excessive force cases, a law enforcement officer effecting a lawful arrest or search "may use such force as is reasonably necessary under the circumstances." *Hill v. Algor*, 85 F. Supp. 2d 391, 411 (D.N.J. 2000) (citing *State v. Williams*, 29 N.J. 27 (1959)); *State v. Simms*, 369 N.J. Super. 466 (App. Div. 2004) ("It is well settled that an officer effecting an arrest may use only such force as is reasonable under the circumstances . . ."); *Noback v. Town of Montclair*, 33 N.J. Super. 420, 427 (App. Div. 1955) ("The law appears to be well established that a police officer in effecting an arrest has the right to use such force as appears reasonably necessary, being responsible, however, for the use of any excessive force.").

Having already determined that Plaintiffs have stated a plausible claim of excessive force under § 1983 as against Officer Esposito, the Court finds, as a general matter, that Plaintiffs have also stated a viable common law claim of assault and/or battery as against Officer Esposito— both of which are predicated on his alleged use of excessive force on the night in question.  *See Mantz v. Chain,* 239 F. Supp. 2d 486, 507 (D.N.J. 2002) ("Where a police officer uses excessive force in effectuating an arrest, that officer may be liable for assault and battery."); *Hendrix v.*

*City of Trenton*, No. 06-3942, 2009 WL 5205996, at *13 (D.N.J. Dec. 29, 2009) (noting generally that "[i]n order to succeed on his assault and battery claim, Hendrix must demonstrate that Neiderman attempted to cause, or purposely, knowingly, or recklessly caused him bodily injury" and denying motion to dismiss assault and battery claims for the same reason the court declined to dismiss plaintiff's claim of excessive force, namely that "after Hendrix was arrested and physically constrained, he did not pose a threat to Neiderman, and therefore, Neiderman's alleged push of Hendrix's head against the ground may have been unreasonable").

Defendants the ECSO and/or County of Essex move to dismiss this claim on the basis that: (1) the New Jersey Tort Claim Act bars the assignment of liability for the alleged intentional torts of a municipal employee, *see* N.J.S.A. 59:2-10 ("A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."); and (2) in any event, they are entitled to "good faith immunity" pursuant to N.J.S.A. 59:3–3 ("A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.").

As to N.J.S.A. 59:2-10, Plaintiffs point to the definition of "willful misconduct," as "the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden." *Fielder v. Stonack*, 141 N.J. 101, 124 (1995). As a result, Plaintiffs theorize that: (a) Defendant Esposito's conduct becomes unlawful if a fact finder determines that his actions were not objectively reasonable under the circumstances, but (b) "this conduct, however, does not rise to the level of "willful misconduct" unless and until the jury determines that Defendant Esposito's act of fatally shooting [Mr.] Gaymon was carried out with actual (not imputed) knowledge that the act is forbidden." (Pl. Opp'n Br. at 28, Docket Entry No. 77). Thus, Plaintiffs argue that a

41

finding that Officer Esposito engaged in common law assault and/or battery does not automatically mean that he was engaged in "willful misconduct" for purposes of shielding his municipal employer from liability for his actions under N.J.S.A. 59:2-10.

As to N.J.S.A. 59:3–3, Plaintiffs argue that a fact question exists as to whether Defendant Officer Esposito acted in good faith when he repeatedly kicked and fatally shot Mr. Gaymon on the night in question.   Defendants, on other hand, argue that there is no factual allegation tending to show that any Defendant failed to act "in the good faith execution and enforcement of the law." (Def. Br. at 26, Docket Entry No. 68).   The standard used to determine whether an employee acted in good faith under N.J.S.A. 59:3–3 is generally the same standard that is used to determine "objective reasonableness" under the qualified immunity analysis of § 1983.  *See Lear v. Township of Piscataway,* 236 N.J. Super. 550, 553-54 (App. Div. 1989); *see generally Kirk v. City of Newark,* 109 N.J. 173, 187 (1988) (noting that the question of "objective reasonableness" ordinarily arises on a motion for summary judgment.").

Having already determined that assessing the reasonableness of Officer Esposito's actions—which requires careful attention to the particular facts and circumstances of the night in question—is not something that can properly be resolved at the pleading stage, the Court finds that there are also issues of fact as to whether Defendant Officer Esposito committed the acts in question, and with actual (not imputed) knowledge that such acts were forbidden by the ECSO. Defendants do not expressly dispute this.   The Court also agrees that there are issues of fact as to whether Officer Esposito acted in good faith when carrying out the acts in question.   Certainly, this goes hand in hand with the Court's ultimate assessment of the reasonableness of Officer Esposito's actions for purposes of Plaintiffs' § 1983 claim of excessive force.  *See Lear,* 236 N.J. Super. at 553-54.  Thus, the Court finds that it would be premature to rule on whether Plaintiffs

are barred from pursuing their common law assault and battery claims against Defendants by virtue of N.J.S.A. 59:2-10 and/or N.J.S.A. 59:3-3 at this stage of the proceedings. *See, e.g., Gattas v. City of Jersey City*, 2010 WL 892187, at *6 (D.N.J. March 5, 2010) ("The issue of whether Gonzalez acted in good faith [in arresting plaintiff] creates a genuine issue as to a material fact" for purposes of assessing whether he is exonerated for his actions pursuant to N.J.S.A. 59:3-3); *see generally Johnson v. De Prospo*, No. 08-1813, 2010 WL 5466255, at *6 (D.N.J. Dec. 30, 2010) ) ("Because there exists a genuine issue of material fact as to whether the officers used excessive force, summary judgment is denied on Johnson's assault and battery claim."). Defendants' motion to dismiss Count Five is therefore denied.

> ii.    **Common Law Negligence (For Failure to Train, Supervise and/or Control Officer Esposito) as Against the ECSO and/or County of Essex and the Supervisory Defendants**

Count Six alleges a common law claim negligence claim (for failure to train, supervise and/or control Officer Esposito) as against the ECSO and/or County of Essex. In particular, Count Six alleges that "Defendants County of Essex, ECSO, and/or the ECSO supervisory defendants, under whose authority Defendant Esposito was operating, were negligent and otherwise reckless in that they failed to adequately train, supervise, and/or properly control Officer Esposito who unlawfully and unconstitutionally used excessive and deadly force against [Mr.] Gaymon." (Sec. Am. Compl., Count Six, ¶ 3). Count Six further alleges that "Defendants County of Essex and ECSO are liable to Plaintiffs under the theory of respondeat superior for the careless, negligent and/or reckless acts of their ECSO supervisory defendants who negligently and/or recklessly failed to adequately train, supervise and/or properly control Officer Esposito and/or negligently, carelessly and/or recklessly failed to ensure that the ECSO standard operating

procedure with respect to staffing the undercover quality of life details in Essex County Parks were followed." (*Id.*, ¶ 7).

In order to establish a common law negligence claim, Plaintiffs must prove four elements: a duty of care, a breach of the duty, proximate cause, and actual damages. *See Weinberg v. Dinger*, 106 N.J. 469, 484 (1987) ("To act non-negligently is to take reasonable precautions to prevent the occurrence of foreseeable harm to others."); *see generally Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 439 (1993) ("Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy.").

Defendants do not challenge the plausibility of Plaintiffs' common law negligence claim; rather, Defendants move to dismiss this Count pursuant to N.J.S.A. 59:5-2(b)(3), which provides that:

> Neither a public entity nor a public employee is liable for:
> a. An injury resulting from the parole or release of a prisoner or from the terms and conditions of his parole or release or from the revocation of his parole or release;
> b. any injury caused by:
> (1) an escaping or escaped prisoner;
> (2) an escaping or escaped person;
> (3) a person resisting arrest or evading arrest;
> (4) a prisoner to any other prisoner ; or
> c. any injury resulting from or caused by a law enforcement officer's pursuit of a person.

N.J.S.A. 59:5-2(b)(3).   In opposition to Defendants' motion, Plaintiffs argue that immunity pursuant to this section of the New Jersey statute is not applicable at this stage of the litigation because a fact question exists as to whether Mr. Gaymon should be considered "a person resisting arrest or evading arrest" at the time of the shooting.   Defendants concede that the immunity granted by this section of the statute is only applicable if Mr. Gaymon was, in fact,

evading arrest.  *See* Def. Br. at 25, Docket Entry No. 68.  ("[N]o Defendant can be liable for any injury caused to Mr. Gaymon *if* he was evading arrest.") (emphasis added).

The Second Amended Complaint alleges that Officer Esposito chased Mr. Gaymon to a pond located within the park; Mr. Gaymon had no avenue of escape; Mr. Gaymon then got down on his knees; Defendant Officer Esposito approached him from behind; Officer Esposito then allegedly kicked Mr. Gaymon several times, unholstered and drew his gun, and shot him. (Sec. Am. Compl., ¶¶ 17-25).  In light of the foregoing factual allegations, the Court agrees with Plaintiffs that a determination of whether the immunity granted by N.J.S.A. 59:5-2(b)(3) is available to the Defendants (or is even applicable) is something that must be determined on a more complete record.  *See, e.g., Klemash v. Monroe Twp.,* 07–4190, 2010 WL 455263, * 12 (D.N.J. Feb. 4, 2010) (explaining that "N.J.S.A. 59:5–2(b)(3) prohibits liability for any injury caused by 'a person resisting arrest or evading arrest'" and concluding that "granting Plaintiff the benefit of all reasonable inferences, a jury must determine whether Plaintiff was resisting arrest or merely requesting that he not be handcuffed behind the back" before a final determination on such immunity could be made).  Defendants' motion to dismiss Count Six—which is based *solely* on immunity pursuant to N.J.S.A. 59:5-2(b)(3)—is therefore denied.

### F.    Count Seven—Wrongful Death

Count Seven of the Second Amended Complaint asserts a "wrongful death" cause of action pursuant to New Jersey's Wrongful Death Act, N.J.S.A. 2A:31-1, et seq.  It alleges, in pertinent part, that "as a direct and proximate result of Defendant Esposito's use of the aforesaid unreasonable, excessive and deadly force . . . and/or the ECSO supervisory defendants failure to properly train, supervise, and/or control Officer Esposito and/or follow their standard operating

procedures with respect to staffing undercover quality of life details in Essex County Parks," Mr. Gaymon died, to the pecuniary loss of his survivors.  (Sec. Am. Compl., ¶ 8).  Count Seven further alleges that "the Estate of the decent was liable for, and in fact paid for, hospital, medical, funeral, and burial expenses and charges for the decedent." (*Id*., ¶ 9).  Finally, it alleges that "[b]y reason of the wrongful death of plaintiff/decedent, the decedent's survivor's have incurred, and in the future will continue to incur, substantial pecuniary losses." (*Id*., ¶ 10).

Defendants move to dismiss this count on the basis that it is not a substantive claim, but rather a mechanisms for recovery upon the finding of the commission of a tort.  In particular, Defendants maintain that Counts Seven and Eight are barred because their underlying tort claims fail.

As a general matter, the Court agrees that "the Wrongful Death Act provides to decedent's heirs a right of recovery for pecuniary damages for their direct losses as a result of their relative's death ***due to the tortious conduct of another***." *Aronberg v. Tolbert*, 207 N.J. 587, 593 (2011) (emphasis added); *see also Miller v. Estate of Sperling,* 166 N.J. 370, 385 (2001) ("The statutory language is designed 'to prevent recovery for death where the decedent could never at any time have maintained an action, as, for example, where there was simply no tortious conduct toward him.'").  Nevertheless, having concluded that Plaintiffs have properly alleged a viable claim of excessive force under § 1983 (and common law assault and/or battery) as against Officer Esposito, and given that a common law negligence claim remains pending as against the ECSO and/or County of Essex and the Supervisory Defendants, the Court declines to dismiss Count Seven on this basis at this time.  Defendants' motion to dismiss this claim is therefore denied.

46

G.      **Count Eight—Survivor Action**

Count Eight similarly alleges that: (a) Officer Esposito used excessive and deadly force when shooting the decedent in the stomach, and, in doing so, violated Mr. Gaymon's rights under the Fourteenth Amendment to the United States Constitution and his well-established rights under the New Jersey State Constitution, (b) as a result of his death, the Estate of the decedent was liable for, and in fact paid for, hospital, medical, funeral and burial expenses and charges for the decedent, and (c) Plaintiffs bring this claim for the benefit of the Decedent's Estate.  Defendants move to dismiss this count on the basis that it is not a substantive claim, but rather a mechanism for recovery upon the finding of the commission of a tort.   As with the wrongful death action claim, Defendants argue that this survivor's act claim should be dismissed because Plaintiffs have failed to properly allege an underlying tort.

"The Survivor's Act, N.J.S.A. 2A:15–3, permits, for the benefit of the decedent's estate, an appointed representative to file any personal cause of action that decedent could have brought had he lived.   In other words, the survival action preserves 'the right of action which the deceased himself would have had[ ] to redress his own injuries.' " *Aronberg*, 207 N.J. at 593 (citations omitted).  N.J.S.A. 2A:15–3 provides:

> In those actions based upon the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he had lived, the executor or administrator may recover all reasonable funeral and burial expenses in addition to damages accrued during the lifetime of the deceased.

Again, having found that Plaintiffs have alleged a viable claim of excessive force under § 1983 (and common law assault and/or battery) as against Officer Esposito, and that a common law negligence claim remains pending as against the ECSO and/or County of Essex and the

Supervisory Defendants, the Court declines to dismiss this count of Plaintiffs' Second Amended Complaint on this basis at this time.  Defendants' motion to dismiss Count Eight of the Second Amended Complaint is therefore denied.

## CONCLUSION

Based on the reasons set forth above, Defendants' motions to dismiss are granted in part and denied in part.  In particular, the Court finds as follows:  Count One (excessive force under § 1983 as against Officer Esposito) may proceed at this time.  Count Two (failure to train and/or supervise under § 1983 as against Supervisory Defendants in their official and individual capacities) is dismissed, in its entirety, *with* prejudice.   Count Three (failure to train and follow ECSO standard operating procedure under § 1983 as against County of Essex) is dismissed *with* prejudice to the extent it is based on failure to train.  To the extent Count Three asserts a *Monell* claim for failure to follow standard operating procedures as against the County of Essex, this aspect of Count Three is dismissed *without* prejudice.  Count Four (violation of NJCRA as against Officer Esposito) may proceed at this time.   Count Five (assault and battery as against Officer Esposito, the ECSO and/or County of Essex) may proceed at this time.  Count Six (negligence as against the ECSO and/or County of Essex and Supervisory Defendants) may proceed at this time.  Counts Seven (wrongful death as against all defendants) and Eight (survivor action as against all defendants), may also proceed at this time.

As to those Counts which the Court has allowed to proceed at this time (Counts One, Four, Five, Six, Seven, Eight and Nine), Plaintiffs are hereby directed to replead these counts exactly as they currently appear in the Second Amended Complaint.  Defendants are hereby

advised that the Court will not entertain a renewed motion to dismiss said counts pursuant to Rule 12(b)(6).

In accordance with the above, Plaintiffs may file a Third Amended Complaint on or before **September 30, 2013,** solely for the purpose of: (a) omitting those claims (and facts corresponding thereto) which have now been dismissed *with* prejudice by the Court, (b) repleading those claims which the Court has allowed to proceed at this time, and (c) curing the pleading deficiencies in Counts One and Three.  In particular, Plaintiffs may amend Count One to include the statement: "During the encounter, Officer Esposito believed that decedent Gaymon engaged in a lewd, non-violent disorderly persons offense."  (Pl. Opp'n Br. at 9, n. 1, Docket Entry No. 77).  As stated above, with the inclusion of this statement, the Court finds that Plaintiffs' have stated a viable claim of excessive force under § 1983 as against Officer Esposito. Thus, the Court declines to entertain a renewed motion to dismiss this claim pursuant to Rule 12(b)(6).  As to Count Three, to the extent it asserts a *Monell* claim for failure to follow standard operating procedures as against the County of Essex, Plaintiffs may amend this Count to include any and all relevant facts that they wish to use to substantiate this claim.  To the extent Plaintiffs choose to replead this aspect of Count Three with the addition of substantive facts, Defendant County of Essex may file a motion to dismiss said count pursuant to Rule 12(b)(6), in lieu of filing an Answer, if it so chooses.

An appropriate Order accompanies this Opinion.

s/ Jose L. Linares
Jose L. Linares
United States District Judge

Date:   August 16, 2013